**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kevin Glass, | ) No. CV-06-1404-PHX-MHM |
| | ) |
| Plaintiff, | ) **ORDER** |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Intel Corporation, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

Currently pending before the Court are Defendant Intel's Motion to Dismiss the Case Pursuant to Fed. R. Civ. P. 16(f) and 37(d) (Dkt.56.), and Motion for Summary Judgment. (Dkt.#74.)   After reviewing the pleadings and determining oral argument unnecessary, the Court issues the following Order.

**I.      Background and Procedural History**

In 1995, Plaintiff Kevin Glass was hired as by the Intel Corporation ("Intel") as a senior staff engineer.  During the course of his employment, Glass filed eight charges of discrimination with the Equal Opportunity Commission ("EEOC") and three lawsuits in federal court against Intel.  The instant lawsuit concerns events surrounding Glass's return from a medical leave of absence in May 2005, through the date of his receipt of an email message from his supervisor at Intel, Hamid Rangchi, on November 3, 2005.  Events

1    occurring prior to this time frame are the subject of CV-06-0671-PHX-MHM.  Events taking

2    place after the November 3, 2005 email are the subject of another suit, CV-07-1835-PHX-

3    MHM.

4         Sometime around 1998 or 1999, Glass began treatment with a psychologist and a

5    psychiatrist for depression and anxiety, which he claims was triggered by a stressful work

6    environment and long work hours.    In November 1998, Glass received an internal

7    performance rating from his then manager, Alan Moore, which rated him as "Improvement

8    Required."   The report noted that Glass had missed several meetings without providing

9    adequate notice, that he had been frequently delinquent in transmitting weekly reports, that

10   he demonstrated poor clarity and had problems communicating with co-workers, and that he

11   had "several issues" regarding the quality of his work.   Thereafter Glass took a one year

12   medical leave of absence from his position.  Intel approved the medical leave.

13        Around April 2001, Glass received a performance review from another manager at

14   Intel, Ameet Bhansali, in which Glass received a trend of "slower" than his peers and was

15   ranked 6 of 6.  This performance review noted that "[r]elative to his peers, Kevin's lack of

16   leadership and inability to plan are clearly reflected."  The 2001 review further noted that

17   Glass' "key shortcomings is the ability to plan," and that he "needs to focus on basic

18   planning items like generating deliverables which can be measured, timeliness, resource

19   needs, etc."

20        In April 2002, Glass was again reviewed, and this time his performance was rated as

21   "successful."  The report did however note that Glass "should improve his organizational,

22   planning and presentation skills (such as design reviews)," "better structure and execute his

23   projects and design flows," and keep better design development records.  Glass was also

24   "strongly encouraged to take project management classes to improve his efficiency and

25   effectiveness."  Likewise, on April 4, 2003, Glass's performance was reviewed by another

26   supervisor, Bobby Nikjou, who rated his performance as "Below Expectations," placing him

27   in the bottom third of his work group. Ten days later, on April 14, 2003, Glass filed the first

28   of what would be eight discrimination charges with the EEOC.

1    In June 2004, two months after receiving another performance review of "Below

2    Expectations," Glass took a second paid medical leave of absence from Intel. Glass's second

3    leave of absence ran from June 21, 2004 through May 5, 2005. The undisputed facts also

4    show that when Glass returned to work his only medical restriction was not to work over 50

5    hours per week, or five days at ten hours of work per day.

6    In late 2004, while Glass was on medical leave, his work group—the Radio Frequency

7    Organization ("RFO")—was disbanded. Upon Glass's return, he, like his colleagues, was

8    afforded a "transition" period, during which time Intel would continue to pay him while he

9    sought out employment opportunities within the company.   On May 3, 2005, two days

10   before Glass returned from medical leave, he was contacted by a project architect, Mark

11   Schuelein, regarding a job opportunity in Intel's Strategic Design Automation and

12   Collaterals/Strategic Design Engineering Group ("SDE Group"). On May 16, 2005, Glass

13   received a formal job offer for placement in the SDE Group. There is some disagreement

14   between the parties regarding the nature of the job offer in the SDE Group: Glass argues that

15   the position was not a positive step in his career, and that the position paid approximately

16   $1000 per year less than his former position in the RFO; Intel contends that the SDE Group

17   position paid Glass more than his previous position. In any event, Glass did not immediately

18   accept the SDE Group position, preferring instead to apply for other work groups that he

19   considered more desirable. Glass did not receive any such offers, and on June 6, 2005, he

20   accepted employment within Intel's SDE Group. Glass alleges that whenever any of the

21   managers in the work groups that he was attempting to secure employment with spoke to his

22   former supervisor, Bobby Nikjou, they became less interested in hiring him. Indeed, in his

23   deposition, Glass claimed that the "hiring party had heard that there were a lot of issues" with

24   him.

25   Nevertheless, on June 6, 2005, Glass began working in his new position with the SDE

26   Group. The SDE Group was responsible for a novel circuit design and implementation of

27   a Network on a Chip concept, and Glass's primary responsibilities included the circuit design

28   of a TBCU functional block. At some point, Hamid Rangchi became manager of the SDE

1    Group.   Rangchi was physically located in Folsom, California, and he managed the SDE

2    Group, which had members in Chandler, Arizona, Santa Clara, California, and Hillsboro,

3    Oregon.   Shortly after taking over the SDE Group, Rangchi allegedly observed that Glass

4    was having difficulty responding to requests, routinely postponed or missed group meetings,

5    was unable to consistently meet project deadlines, and failed to adequately communicate with

6    other employees about critical aspects of his assigned projects.

7          In August 2005, Rangchi requested and received copies of Glass's past performance

8    reviews.  Rangchi noticed that the performance problems raised in these previous reviews

9    were similar to problems that Glass was exhibiting in the SDE Group.   Rangchi also

10   contacted Glass's former supervisor, Bobby Nijou, regarding Glass's performance.

11         Between August and November 2005, Glass allegedly continued to demonstrate

12   performance deficiencies, such as failing to efficiently organize assignments and prioritize

13   them according to relative importance, failed to effectively communicate to other SDE Group

14   members, and could not meet critical group deadlines.

15         In September 2005, Rangchi held a one on one meeting with Glass to discuss various

16   issues related to Glass's performance.   At the meeting, Rangchi told Glass that he was

17   expected to be prepared at future group meetings, that he needed to have his oral presentation

18   prepared in writing before he attempted to present it to the group, and that Glass was to

19   provide Rangchi with weekly updates regarding his progress towards certain performance

20   benchmarks.  Rangchi also reminded Glass that he had ignored two requests to move his

21   cubicle to the second floor, where Glass would be seated closer to other SDE Group

22   members.  Following the meeting, Glass emailed Rangchi, stating that he had just returned

23   from long term medical leave and his physician had placed a work restriction that limited him

24   to no more than 50 hours per week or 10 hours per day, 5 days per week.

25         On November 3, 2005, Rangchi again emailed Glass to take issue with his

26   performance.   The email contained a detailed structured work plan that Rangchi had

27   developed for Glass to finish within the following five weeks.  Rangchi also noted that Glass

28   should read through the plan, because it was to be discussed at a meeting between the two

1 men on the following day, November 4, 2005. The next day, Glass emailed Ragnchi to

2 criticize the suggestions contained in the five week work plan. Glass accused Rangchi of

3 making significant misrepresentations regarding his performance. Rangchi responded to the

4 email, reminding Glass that they would be discussing the plan during their afternoon

5 meeting. Shortly thereafter, Glass canceled the meeting. On the following Monday, Glass

6 filed his fifth charge of discrimination with the EEOC, challenging Ranchi's November 5,

7 2005 email, among other things. The instant lawsuit followed.

8          Following the November 3, 2005 incident,  Glass remained employed by Intel at his

9 then current pay, benefits, grade level and job responsibilities. In addition, Intel permitted

10 Glass to take vacation between December 19, 2005 and January 6, 2006. In February 2006,

11 Glass began what would be his third medical leave of absence from Intel.

12 **II.     Legal Standard**

13          Typically, a motion for summary judgment may be granted if the evidence shows "that

14 there is no genuine issue of material fact and that the moving party is entitled to judgment

15 as a matter of law." Fed. R. Civ. P. 56(c) . To defeat the motion, the non-moving party must

16 show that there are genuine factual issues "that properly can be resolved only by a finder of

17 fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty

18 Lobby, Inc., 477 U.S. 242, 250 (1986). The Court views the evidence in the light most

19 favorable to the non-moving party and draws any reasonable inferences in the non-moving

20 party's favor. Warren v. City of Carlsbad, 58 F.3d 439, 443 (9th Cir. 1995, cert. denied, 516

21 U.S. 1171 (1996).

22          "As a general matter, the plaintiff in an employment discrimination action need

23 produce very little evidence in order to overcome an employer's motion for summary

24 judgment. This is because the ultimate question is one that can only be resolved through a

25 searching inquiry—one that is most appropriately conducted by the trier of fact, upon a full

26 record." Chuang v. Univ. of Cal. Davis, Board of Trustees, 225 F.3d 1115, 1123 (9th Cir.

27 2000) (quoting Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1410 (9th Cir. 1996)

28 (internal quotations omitted)).

1    **III.    Glass's Discrimination Claims Under the ADA and ADEA**

2         **A.    Direct Evidence of Discrimination**

3         Glass contends that the familiar burden shifting framework of <u>McDonnell Douglas</u>

4    <u>Corp. v. Green</u>, 411 U.S. 792 (1973) does not apply to the instant case.  As the Supreme

5    Court has noted, the <u>McDonnell Douglas</u> framework "is inapplicable where the plaintiff

6    presents direct evidence of discrimination." <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S.

7    111, 121 (1985); <u>see also</u> <u>AARP v. Farmers Group, Inc.</u>, 943 F.2d 996, 1000 n.7 (9th Cir.

8    1991) ("[W]hen there is direct evidence of discrimination . . . the prima facie case analysis

9    is inapplicable.").  Direct of evidence of discrimination is defined as "evidence of conduct

10   or statements by persons involved in the decision making process that may be viewed as

11   directly reflecting the alleged  discriminatory attitude . . . sufficient to permit the fact finder

12   to infer that that attitude was more likely than not a motivating factor in the employer's

13   decision." <u>Enlow v. Yellow Cab Co., Inc.</u>, 371 F.3d 645, 650 (9th Cir. 2004) (quoting

14   <u>Walton v. McDonnell Douglas Corp.</u>, 167 F.3d 423, 426 (8th Cir. 1999)).

15        Glass argues that he has presented a sufficient amount of direct evidence from which

16   a rationale jury could infer discrimination on the part of Intel, thereby foreclosing the

17   <u>McDonnell Douglas</u> framework.  To this end, Glass points to a single statement allegedly

18   made by Rangchi, stating that he "could get someone younger and with no issues" to replace

19   Glass in the SDE Group.  Glass contends that the statement constitutes direct evidence of age

20   and disability discrimination, and that by making such a statement, a jury could find that

21   Rangchi's actions were motivated by an improper bias against Glass.  Intel responds by

22   arguing that even if Rangchi were to have made such a statement—a fact which Intel

23   contests—his comment can be characterized as no more than a stray remark.  <u>See</u> <u>Hopkins</u>

24   <u>v. Elec. Data Sys. Corp.</u>, 196 F.3d 655, 658 (6th Cir. 1999) (finding that a supervisor's

25   isolated reference to plaintiff as "the mentally ill guy on Prozac that is going to shoot the

26   place up" was not direct evidence of discrimination); <u>Nidds v. Schindler Elevator Corp.</u>, 113

27   F.3d 912, 918-19 (9th Cir. 1996) (holding that an employer's use of the phrase "old timers"

28   did not support inference of discriminatory motive).  Intel points to the Ninth Circuit case of

1   Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1993), which Glass also favorably cited.

2   In Nesbit, the plaintiff's supervisor informed him that the company did not "necessarily like

3   grey hair." Id. at 705. Noting that the remark was "uttered in an ambivalent manner and was

4   not tied directly to [plaintiff's] termination, when taken together with all of the evidence

5   presented by  plaintiff, the statement "fell short of creating an inference of age

6   discrimination." Id.

7        As Intel argues, Rangchi's comment cannot be construed as direct evidence of either

8   disability or age discrimination. With respect to disability discrimination, it is not clear that

9   Rangchi's use of the word "issues" refers to any specific medical problem associated with

10   Glass's alleged disability. Indeed, the word may just as aptly refer to the kind of workplace

11   performance related "issues" that Rangchi and several of Glass's preceding supervisors had

12   raised with Glass, all of which are well documented and uncontroverted. With respect to age

13   discrimination, Glass has not shown, nor has he even attempted to argue, that Rangchi's

14   alleged reference to replacing him with a "younger" worker was related to any type of

15   personnel "decision making process" on the part of Intel.  See Enlow, 371 F.3d at 650. The

16   Ninth Circuit has stated that "remarks  . . . when unrelated to the decisional process, are

17   insufficient to demonstrate that the employer relied on illegitimate criteria, even when such

18   statements are made by the decision maker in issue." Merrick v. Farmers Ins. Group, 892

19   F.2d 1434, 1438 (9th Cir. 1990).  As such, Glass has not created an inference of

20   discrimination based on direct evidence and the Court will apply the McDonnell Douglas

21   burden shifting framework.

22        **B.   The McDonnell Douglas Burden Shifting Framework**

23       The McDonnell Douglas analysis applies equally to claims brought under the ADA

24   and ADEA. See Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1093 (9th Cir. 2003)

25   (ADA); Diaz v. Eagle Produce Ltd., 521 F.3d 1201, 1207 (9th Cir. 2008) (ADEA). Under

26   the burden shifting framework, the employee must first establish a prima facie case of

27   discrimination. If the employee has adequately established a presumption of discrimination,

28   the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason

1  for its adverse employment action.  If the employer satisfies its burden, the employee must

2  then prove that the reason advanced by the employer constitutes mere pretext.  See Aragon

3  v. Republic Silver State Disposal, Inc., 292 F.3d 654, 659 (9th Cir. 2002); Wallis v. J.R.

4  Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

5                          **1.      Prima Facie Case under the ADA**

6          In order to establish a prima facie case of discrimination under the ADA, Glass needs

7  to show that (1) he is disabled under the Act; (2) he is qualified to perform essential functions

8  of his job; and (3) that he suffered an adverse employment action because of his disability.

9  See Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1353 (9th Cir. 1996).   That Glass was

10 qualified to perform his job is not in dispute.  Instead, Intel is challenging whether Glass is

11 disabled under the Act and whether he has suffered an adverse employment action.

12         Under the ADA, a person is disabled when they have (1) a physical or mental

13 impairment that substantially limits one or more major life activities; (2) a record of such

14 impairment; or (3) is regarded as having such an impairment.   See 42 U.S.C. § 12102(2).

15 With respect to the instant case, Glass is attempting to proceed under two theories of

16 disability.  In his Complaint, Glass alleged that Intel discriminated against him based on a

17 "perceived mental disability."  Yet, in his brief in opposition to Intel's summary judgment

18 motion, Glass apparently changed his argument  to include a claim that he was actually

19 disabled..

20         Glass bears the burden of establishing that he has an actual disability within the

21 meaning of the ADA.  See Thorton v. McClatchy Newspapers, Inc., 261 F.3d 789, 794 (9th

22 Cir. 2001).  Mental conditions, such as stress and depression, may be considered impairments

23 covered by the ADA, "depending on whether these conditions result from a documented

24 physiological or mental disorder."  Holihan v. Lucky Stores, Inc., 87 F.3d 362, 366 n.3 (9th

25 Cir. 1996). Here, Glass has not presented the Court with any testimony from his psychiatrist

26 or psychologist— whether it be in the form of deposition, affidavit or otherwise—to support

27 a claim of actual disability.  In fact, besides the bare bones assertions contained in several of

28 his own declarations, Glass has not presented any medical evidence.  "It is well settled that

1   only admissible evidence may be considered by the trial court in ruling on a motion for

2   summary judgment."  Beyene v. Coleman Sec. Serv., Inc., 854 F.2d 1179, 1181 (9th Cir.

3   1988).   Therefore, Glass's own statements about what his treating physician told him

4   regarding the severity of his depression and stress may not be properly considered by the

5   Court, since they constitute inadmissable hearsay.  Fed. R. Civ. P. 801 and 802. When faced

6   with a total absence of admissible medical evidence to support his claim of suffering from

7   a mental disability, the Court must conclude that Glass was not disabled for purposes of the

8   ADA.

9          Furthermore, even if Glass could support his actual disability claim with admissible

10  evidence, it would still fail because Glass cannot demonstrate that his mental ailments

11  "substantially limit[] one or more major life activities." See 42 U.S.C. § 12102(2).   This is

12  because the single life activity that Glass claims to have been limited in is that of working.

13  Yet by Glass's own admission, the only limitation that was placed upon his ability to work

14  at Intel after he returned from medical leave in May 2005 was that he could not work for over

15  50 hours per week or 10 hours per day for 5 days.  Glass's undisputed ability to work more

16  than 40 hours per week between May and November 2005 defeats his claim of being

17  substantially limited during the relevant time period.  See e.g. Kellogg v. Union Pac. R. Co.,

18  233 F.3d 1083, 1087-88 (8th Cir. 2000) (holding that an employee who had been diagnosed

19  with major depression and anxiety, and who had taken a resulting leave of absence, was not

20  disabled under the ADA when his work schedule was restricted to "forty-hour, daylight only

21  work week"); Brennan v. Nat'l Tel. Directory Corp., 850 F. Supp. 331, 343 (E.D. Pa. 1994)

22  ("Obviously, anyone who can work 40 hours a week as a limitation of their abilities is not

23  suffering a substantial impairment of . . .  the ability to work."); Overton v. Tar Heel Farm

24  Credit, 942 F. Supp. 1066, 1070 (E.D.N.C. 1996) (finding that employee suffering from

25  anxiety and depression who could work up to 45 hours per week failed to state a cognizable

26  ADA claim.).

27         With respect to Glass's perceived disability claim, a person is regarded as disabled

28  when a covered entity, such as Intel, "mistakenly believes that a person has a physical [or

1   mental] impairment" or "mistakenly believes that an actual, nonlimiting impairment

2   substantially limits one or more major life activities."  Sutton v. United Airlines, Inc., 527

3   U.S. 471, 489 (1999).  Here, Glass has failed to adequately demonstrate how Intel could have

4   possibly regarded him as being "significantly restricted in the ability to perform either a class

5   of jobs or a broad range of jobs in various classes as compared to the average person having

6   comparable training, skills, and abilities."  29 C.F.R. § 1630.2(j)(3)(i).  The undisputed facts

7   in the record show that Glass's supervisor at Intel, Hamid Rangchi, did not consider Glass

8   to be more limited than any other member of the SDE Group.

9        In addition, the Ninth Circuit has held that a plaintiff claiming to have been regarded

10  as substantially limited in the major life activity of working "must present specific evidence

11  about relevant labor markets to defeat summary judgment" and "identify what requirements

12  posed by the class of . . . jobs . . .were problematic in light of the limitations imposed."

13  Walton v. U.S. Marshals Serv., 492 F.3d 998, 1009 (9th Cir. 2007) (quoting Thornton, 261

14  F.3d at 795-96).  Because Glass has not presented **any** evidence concerning the class of jobs

15  from which he was allegedly perceived to be disqualified from or from which he was

16  significantly restricted in his ability to perform, Intel is entitled to summary judgment on this

17  basis alone.  See Thorton, 261 F.3d at 795-96 ("Under the law of our circuit, a plaintiff must

18  present specific evidence about relevant labor markets to defeat summary judgment on a

19  claim of substantial limitation of 'working.'").

20       Even if this Court were to assume that Glass could carry his burden regarding an ADA

21  qualified disability, Glass would still need to demonstrate that he suffered adverse

22  employment action based on that actual or perceived disability.  As Intel notes, there are only

23  two possible adverse actions that Glass may have been subjected to: (1) the negative reaction

24  that various Intel managers had to Glass's internal employment application upon his return

25  to work in 2005; and (2) the November 3, 2005 email from Rangchi and the initiation of a

26  timing specific 5 week work plan that Glass was to expected to abide by.  With respect to

27  adverse actions that Glass allegedly suffered after returning to Intel in May 2005, Intel argues

28  that Glass claims that various hiring managers had heard "rumors" or "negative things" about

1   him, however, when deposed, Glass failed to identify the content or source of even a single

2   rumor.   Intel contends that this precisely the kind of "mere speculation, conjecture, or

3   fantasy" that courts have held will not defeat a motion for summary judgment.  See Harrison

4   v. Howmedica Osteonics Corp., CV-06-0745-PHX-RCB, 2008 WL 906585, at *26 (D. Ariz.

5   March 31, 2008) (internal citations omitted).  This Court agrees.

6          In addition, even if there were proof that this kind of criticism or badmouthing

7   occurred, Glass has still failed to prove that such conduct amounted to an adverse

8   employment action.  As Intel notes, any negative remarks made by Intel employees did not

9   alter Glass's pay, benefits, grade level or job responsibility.  Indeed, once the RFO work

10  group was terminated, Glass received a formal job offer only eleven days after returning from

11  medical leave. Also, his newly acquired position in the SDE Group was—in any measurable

12  sense—comparable to his previous position within Intel.

13         Similarly, Rangchi's November 3, 2005 email cannot be considered adverse

14  employment action, since the email was in essence no more than a proposed five week

15  schedule for Glass to complete  various tasks that had already been assigned to him and were

16  undisputably part of his normal job requirements.   As Intel notes, even performance

17  management tools that are significantly more formal than those used by Rangchi in his

18  November 3, 2005 email do not generally rise to the level of an adverse action, unless

19  accompanied by a demotion, pay change, shift in responsibilities, or some other tangible

20  negative action on the part of the employer.  See Haynes v. Lelv 3 Comm., LLC, 456 F.3d

21  1215, 1225 (10th Cir. 2006).

22                          **2.      Prima Facie Case under the ADEA**

23         Under the ADEA, a plaintiff can establish a prima facie case of age discrimination by

24  demonstrating that he was (1) at least 40 years old; (2) performing his job satisfactorily; (3)

25  was subject to an adverse employment action; and (4) was either replaced by or treated less

26  favorably than similarly situated individuals outside the protected class. Coleman v. Quaker

27  Oats Co., 232 F.3d 1271, 1281 (9th Cir. 2000).

28

1     With respect to whether Glass was subject to an adverse employment action, his

2   ADEA discrimination claim must fail for the same reason that his ADA claim fails—Glass

3   cannot show that he suffered a change in position, salary, benefits, title or job duties.  See

4   Galabaya v. New York City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000) (noting that

5   summary judgment is appropriate where an employee "failed to create a genuine issue of

6   material fact on the issue of whether [he suffered] an adverse employment action.").

7     With respect to whether Intel treated Glass less favorably than similarly situated

8   individuals outside his protected class, the Court has not been made aware whether any

9   evidence exists, whether admissible or otherwise, that would allow the Court to infer that a

10  younger Intel employee was treated more favorably than Glass during the relevant time

11  period.  See Ohton v. City of Phoenix, CV-360-PHX-MHM, 2007 WL 4405006, at *6 (D.

12  Ariz. Dec. 13, 2007).  Where a party "fails to make a showing sufficient to establish the

13  existence of an element essential to that party's case," it is not possible to survive summary

14  judgment, "since a complete failure of proof concerning an essential element of the

15  nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v.

16  Catrett, 477 U.S. 317, 322-23 (1986).

17  **IV.   Glass's Retaliation Claims Under the ADA and ADEA**

18    For Glass to succeed on a theory of retaliation, he must first establish a prima facie

19  claim.  A prima facie claim of retaliation is met when the employee demonstrates that (1) he

20  is engaged in a statutorily protected activity; (2) his employer subjected him to adverse

21  employment action; and (3) there was a casual link between the protected activity and the

22  adverse employment action.  See Bergene v. Salt River Project Agricultural Improvement

23  & Power Dist., 272 F.3d 1136, 1140-41 (9th Cir. 2001).  Intel challenges whether Glass can

24  meet the second and third elements.  Unfortunately, in his opposition brief, Glass failed to

25  discuss the relevant elements that make up a prima facie retaliation claim under either the

26  ADA or ADE, and the Court has therefore been forced to analyze the merits of Defendant's

27  argument without the benefit of an adequate response from Plaintiff.

28

1     In order to establish the requisite adverse employment action, Glass must show that

2 "a reasonable employee would have found the challenged action materially adverse . . .."

3 Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2415 (2006).

4 Materially adverse actions are those actions that would "dissuade [] a reasonable worker from

5 making or supporting a charge of discrimination." Id. The Supreme Court has emphasized

6 that "trivial harms" do not rise to the level of actionable retaliation, and that individuals are

7 only protected from the kind of retaliatory action that "produces an injury or harm." Id. at

8 2414-15. As is the case with his ADA and ADEA discrimination claims, Glass cannot show

9 that he has suffered an adverse employment action. Indeed, Glass did not experience a

10 decrease in pay or job responsibilities after returning to Intel in May 2005. Nor is there

11 evidence demonstrating that Glass experienced material adversity following the November

12 3, 2005 email from Rangchi.   As Intel points out, a reasonable worker in Glass's position

13 would not have been dissuaded from making a discrimination charge, as Glass himself filed

14 his fifth charge of discrimination with the EEOC only days after the November 3, 2005 email

15 from Ragnchi. See DeHart v. Baker Hughes Oilfield Operations, Inc., No. 05-21087, 2007

16 WL 126081, at *3 (5th Cir. Jan. 19, 2007) (noting that where a plaintiff in fact made a

17 discrimination claim after "several weeks" later, there was no adverse employment action).

18 To the extent that Glass was unsettled by the performance reviews that he received from his

19 supervisors, the perceived lack of success that he experienced while searching for a new

20 position within the company in May 2005, or the work plan devised by Rangchi around

21 November 2005, those offenses can at best be characterized as the kind of "trivial harms"

22 that are not actionable under a retaliation theory. Because Glass has failed to establish at

23 least one of the essential elements of his claim, it is unnecessary for the Court to engage in

24 any further analysis on this issue. See generally Celotex Corp., 477 U.S. at 322-23

25     **Accordingly**,

26     **IT IS HEREBY ORDERED** granting Defendant's Motion for Summary Judgment.

27 (Dkt.#74.)

28

- 13 -

1    **IT IS FURTHER ORDERED** denying as moot Defendant's Motion to Dismiss the

2  Case Pursuant to Fed. R. Civ. P. 16(f) and 37(d).  (Dkt.#56.)

3    **IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

4    DATED this 11th day of March, 2009.

5

6

7  _____

8  Mary H. Murgula
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -